**Isaiah FEBRES, et al., Plaintiffs,**

v.

**THE CITY OF NEW YORK, et al., Defendants.**

**No. 03 CIV. 0017 DF.**

United States District Court, S.D. New York.

Sept. 22, 2006.

---

Deborah I. Meyer, New York City Law Department, Lisa S. Rabinowitz, NYC Law Department, Office of the Corporation Counsel, New York City, for defendants.

James I. Meyerson, New York City, for plaintiffs.

## MEMORANDUM AND ORDER

FREEMAN, United States Magistrate Judge.

### INTRODUCTION

This civil rights action, commenced by plaintiffs on their own behalf and on behalf of two putative plaintiff classes, is before me on consent pursuant to 28 U.S.C. § 636(c). Pending before the Court is defendants' motion, pursuant to Rule 12 of the Federal Rules of Civil Procedure, to dismiss all claims arising from plaintiffs' class allegations.[1] For the reasons set forth below, the motion to dismiss plaintiffs' class claims is granted, to the extent such claims are based on the federal Constitution or analogous provisions of the New York State constitution. To the extent plaintiffs have alleged state-

law class claims that sound in tort or are otherwise based on non-constitutional grounds, the Court will reserve decision, so as to afford the parties an opportunity to address an issue not raised in their papers, *i.e.*, whether such claims should be dismissed for failure to plead compliance with state notice-of-claim requirements, applicable to suits against a municipality.

### BACKGROUND

#### A. *Factual Background*

On December 13, 2002, juvenile plaintiff Isaiah Febres ("Febres"), a student at the St. Dominic School, was arrested for his alleged involvement in a fight with another student at the school approximately three weeks earlier. (Third Amended/Supplemental Complaint, dated Oct. 17, 2004 ("3d Am. Compl.") (Dkt.18), ¶ 44.) On the date of his arrest, Febres was called to the office of his school, where police officers placed him in handcuffs before transporting him to the 49th Precinct in the Bronx. (*Id.* ¶ 42.) The police then contacted Febres's father, William Febres, who arrived at the 49th Precinct shortly thereafter. (*Id.* ¶ 69.) William Febres was informed by defendant Officer Asmat Allie that a "juvenile report" or "youth report" ("Juvenile Report") would be executed and maintained by the New York City Police Department ("NYPD") for one year, but that no criminal or other proceeding would occur. (*Id.* ¶¶ 70–71.) Febres then left the 49th Precinct in the custody of his father, and no Family Court proceeding or other proceeding was ever instituted against him. (*Id.* ¶ 71.) After the arrest, and upon advice of counsel, William Febres and his wife, Katherine Kortright, Febres's mother, attempted to obtain a copy of Febres's Juvenile Report. (*Id.* ¶ 84.) They were told that they could not secure a copy of the Juvenile Report unless it was subpoenaed. (*Id.*) Neither William Febres nor Ms. Kortright were informed of any right to a follow-up investigation regarding the

---

1. Although defendants' motion is styled as a motion for judgment on the pleadings pursuant to Rule 12(c), as defendants have not yet filed an answer to the complaint, their motion is more properly construed as a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See Foti v.*

*NCO Fin. Sys.,* 424 F.Supp.2d 643, 647 n. 1, 653 (S.D.N.Y.2006). In any event, in deciding a Rule 12(b)(6) motion, the Court applies the same standard as would be applicable to a motion to dismiss under Rule 12(c). *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999).

allegations contained in the Juvenile Report. (*Id.* ¶ 139.)

On December 18, 2002, juvenile plaintiff Athena Padouvas ("Padouvas"), a student at LaGuardia High School, was allegedly involved in purchasing a knife from another student at the school. (*Id.* ¶¶ 108, 113, 123.) When school officials learned of this incident, Padouvas's mother, Joan Padouvas, was called to come to the school. (*Id.* ¶¶ 115, 123.) At the school, Joan Padouvas was informed by a police officer that a Juvenile Report regarding the incident would be prepared and maintained by the NYPD until Padouvas reached 18 years of age. (*Id.* ¶ 116.) Padouvas was then released from school into her mother's custody. (*See* Plaintiffs' Memorandum in Opposition to the Defendants' Rule 12 Motion to Dismiss the Plaintiffs' Class Claims, dated Mar. 10, 2005 ("Pl.Mem."), at 5.) Although administrative charges were apparently filed against Padouvas,[2] it does not appear that she was ever arrested. (*See* 3d Am. Compl. ¶¶ 124, 129–30; Pl. Mem. at 5.) Joan Padouvas was not given the opportunity to contest the preparation of a Juvenile Report regarding her daughter, nor was she given a copy of any Juvenile Report that may have been prepared in her daughter's case. (3d Am. Compl.¶ 117.)[3] Joan Padouvas was also not informed of any right to a follow-up investigation regarding the allegations contained in any such Juvenile Report. (*Id.* ¶ 139.)

### B. *The Juvenile Report*

A Juvenile Report is a one-page document (*see* 3d Am. Compl., Ex. A (Febres Juvenile Report)), which serves to "record and investigate certain complaints concerning juveniles at least seven (7) years of age, but less than

sixteen (16) years of age" (3d Am. Compl., Ex. D (excerpt from NYPD Juvenile Reference Manual)). According to the NYPD Juvenile Reference Manual, a Juvenile Report "(1) serves as a statistical tool in lieu of a complaint report, . . . (2) diverts juveniles from the court process, and (3) identifies potential delinquents." (3d Am. Compl., Ex. D (excerpt from NYPD Juvenile Reference Manual).)

### C. *The Cuevas v. Leary Stipulation*

On May 18, 1970, a group of parents commenced a class action against the NYPD, on their own behalf and on behalf of their minor children, challenging the procedures regarding the maintenance and dissemination of Juvenile Reports, and alleging that such procedures violated their and their children's constitutional rights to due process and privacy. *Cuevas v. Leary*, No. 70 Civ. 420 (S.D.N.Y.); *see* 3d Am. Compl. Ex. B (*Cuevas v. Leary*, Stipulation So Ordered by Judge Charles L. Brieant Jr. (S.D.N.Y. June 28, 1972) ("*Cuevas* Stip."), at 1–2).[4] That action was terminated by agreement of the parties when, on June 28, 1972, the parties entered into a stipulation providing for certain procedures to be followed in the preparation, maintenance, dissemination and destruction of Juvenile Reports. (*See Cuevas* Stip.)

The *Cuevas* Stipulation, which is apparently still in effect, provides that information regarding Juvenile Reports may only be provided to (1) Youth Officers, Youth Division Personnel or Detectives in connection with an investigation, (2) Desk Officers when exercising discretion to arrest or not arrest a

---

2. Padouvas entered a plea of no contest to the charge of possession of a knife, apparently in the belief that she would then have an "early resolution conference" that would enable her to avoid expulsion. (*Id.* ¶ 124.) When Padouvas was nonetheless suspended and eventually expelled from the school, she withdrew her no contest plea. (*Id.* ¶¶ 120, 127, 129.) Padouvas was then afforded a hearing at the Manhattan Borough Suspension Hearings Office. (*Id.* ¶ 129.) Following this hearing, an Administrative Law Judge/Hearing Officer dismissed the charges against Padouvas and reinstated her as a student at LaGuardia High School. (*Id.* ¶ 130.)

3. A Juvenile Report for Padouvas has not been produced in discovery, and it is unclear whether a Juvenile Report was, in fact, ever prepared with respect to Padouvas. (*See* 3d Am. Compl. ¶ 136; Pl. Mem. at 6.)

4. Although Plaintiffs represent that the docket number for *Cuevas v. Leary* is No. 70 Civ. 420 (*see* 3d Am. Compl. ¶ 137), the docket number on the copy of the *Cuevas* Stipulation that has been provided to the Court is partially illegible.

juvenile, and (3) public or private agencies, but only for the purposes of rehabilitation or treatment services. (*See Cuevas* Stip. at 5–7; 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual).) Under the Stipulation, Juvenile Report information may not be divulged to any person or agency in relation to employment, housing or public assistance, or to probation personnel for sentencing or dispositional purposes. (*See Cuevas* Stip. at 6; 3d Am. Compl., Ex. C.) Except as noted above, Youth Officers may not make known the existence or non-existence of a Juvenile Report, and copies of Juvenile Reports may not be provided to any public or private body or agency or any official. (*See Cuevas* Stip. at 5; 3d Am. Compl., Ex. C.)

In addition, under the *Cuevas* Stipulation, the NYPD was required to amend its own procedures to provide clearly for (1) the notification of parents and guardians in all instances where a Juvenile Report is issued, (2) advice to such parents that they may request a follow-up investigation to determine the accuracy of the allegations in the Juvenile Report, and (3) procedures for the destruction of all Juvenile Reports that follow-up investigations deem to be unfounded. (*See Cuevas* Stip. at 7.) The stipulation dictates that follow-up investigations are to be conducted by the NYPD as a regular procedure and are to be initiated promptly upon the request of a parent or guardian; the NYPD, however, is under no duty to provide any form of adversary hearing. (*See id.*) Furthermore, while the clear import of the *Cuevas* Stipulation is that certain procedures and protections, as set forth in the stipulation, are to accompany the execution and maintenance of Juvenile Reports for as long as any such reports are made and used by the NYPD (*see id.* at 9), the stipulation also provides that the entire program by which Juvenile Reports are prepared in the first instance (the so-called "Y.D. program"[5]) may be discontinued "for any reason in the sole discretion of the [NYPD]" (*id.*).

### D. Plaintiffs' Class Allegations

Febres, Padouvas, and their parents (collectively, "Plaintiffs") commenced this action in January 2003 against defendants the City of New York, New York City Police Commissioner Raymond Kelly, Police Officer Asmat Allie, and Police Officer "John" Williams (collectively, "Defendants"), challenging Defendants' policies and practices associated with Juvenile Reports. Plaintiffs' class action allegations, which are generally described in Section IV of the Third Amended/Supplemental Complaint (*see* 3d Am. Compl. ¶¶ 19–22), arise from the conduct of NYPD officers in allegedly executing and maintaining Juvenile Reports for Febres, Padouvas, and others similarly situated, and in allegedly failing to provide these juveniles or their parents or guardians with copies of the reports and notice of their rights to challenge the allegations contained therein. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Febres and Padouvas (the "Juvenile Plaintiffs") seek to represent a class of all youths (the putative "Juvenile Class") who have had Juvenile Reports executed and maintained by officers of the NYPD over the last three years. (*See id.* ¶ 19.) Febres's parents and Padouvas's mother (the "Parent Plaintiffs") seek to represent a class of the parents and guardians of all such youths (the putative "Parent/Guardian Class"). (*See id.*)

On behalf of the putative Juvenile Class, Febres and Padouvas claim that certain police officers and the City of New York have violated the rights of class members under 42 U.S.C. § 1983 and/or under New York state law, by their practice of executing and maintaining Juvenile Reports. With respect to their federal claims, the Juvenile Plaintiffs contend that this practice: (1) constitutes a "constructive seizure" in violation of the class members' Fourth Amendment rights (*see* 3d Am. Compl. ¶¶ 20, 183), (2) violates the class members' substantive due process rights, particularly their right to privacy (*see id.* ¶¶ 21, 186), (3) violates the class members' equal protection rights (*see id.* ¶ 21), and (4) violates the class members' procedural due

---

**5.** The *Cuevas* Stipulation uses the terms "Y.D. cards" and "Y.D. Records" to refer to Juvenile Reports; the term "Y.D. program," however, is not defined. Presumably, "Y.D." is an abbrevia-

tion of "Youthful Defender," and "Y.D. program" refers to the program, as a whole, by which Juvenile Reports are executed and maintained.

process rights (*see id.* ¶¶ 22, 189).[6]  On behalf of the putative Parent/Guardian Class, the Parent Plaintiffs claim that the Defendants' failure to provide class members with copies of their children's Juvenile Reports or to notify class members of their right to an investigation of the allegations contained in those reports constitutes a violation of the class members' rights to procedural due process.  (*See id.* ¶¶ 22, 192.)

The class-wide claims set out in the Third Amended/Supplemental Complaint are divided as follows: The Section 1983 claims that the Juvenile Plaintiffs assert on a class-wide basis, against the named individual defendants, are set forth in the Fifth, Sixth, and Seventh Causes of Action.  (*See id.* ¶¶ 182–90.)  The single Section 1983 claim that the Parent Plaintiffs assert on a class-wide basis, against the named individual defendants, is set forth in the Eighth Cause of Action.  (*Id.* ¶¶ 191–93.)  In the Tenth Cause of Action (*id.* ¶¶ 198–201), all Plaintiffs allege a Section 1983 class claim against the City of New York, based on a purported *Monell* violation,[7] and in the Eleventh and Twelfth Causes of Action (*id.* ¶¶ 202–07), all Plaintiffs appear to allege class claims based on New York state law.

### DISCUSSION

### I.  APPLICABLE LEGAL STANDARDS

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff. *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (citing *Albright v. Oliver*, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)).  On a motion to dismiss, the issue is not whether the plaintiff will prevail ultimately, but whether the plaintiff is entitled to offer more evidence in support of his claims.  *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998).  A claim may not be dismissed under Rule 12(b)(6) unless "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir.1994) (internal quotation marks and citation omitted).

On a motion to dismiss the complaint, "[t]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995).  Thus, on such a motion, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' "  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)).  In this case, as the *Cuevas* Stipulation and certain written NYPD procedures are attached as exhibits to the Third Amended/Supplemental Complaint (*see* 3d Am. Compl., Exs. A–F), the Court may consider those materials on Defendants' motion.

### II.  PLAINTIFFS' CLASS CLAIMS

#### A.  Federal Claims

To be able to succeed on a claim under 42 U.S.C. § 1983, a plaintiff must plead facts capable of showing (1) that he has been

---

6.  Febres also appears to assert individual Section 1983 and state-law claims predicated on, *inter alia,* false arrest (*see id.* ¶¶ 170–71, 174), the use of excessive force (*see id.* ¶¶ 177, 195–96), and improper removal from school (*see id.* ¶¶ 180, 209, 212–13).  As Defendants have not moved to dismiss those individual claims (which are set forth in the First, Second, Third, Fourth, Ninth, Thirteenth, and Fourteenth Causes of Action), those claims are not addressed here.  Padouvas does not assert any claims apart from those asserted on behalf of the putative Juvenile Class.

7.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (establishing that "local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.").

deprived of a federal right by (2) a person acting under color of state law. *See Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005). Here, Plaintiffs' Section 1983 class claims are predicated on alleged violations of the Fourth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution.

### 1. Fourth Amendment Claim (Pleaded on Behalf of the Putative Juvenile Class)

■ The Fourth Amendment to the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.'" *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

Febres and Padouvas contend, on behalf of the putative Juvenile Class, that the execution of a Juvenile Report constitutes a "constructive seizure" in violation of their Fourth Amendment rights. (*See* 3d Am. Compl. ¶¶ 20, 183.) Yet, while a "seizure" of the Juvenile Plaintiffs may have occurred at some point in connection with the circumstances giving rise to the execution of Juvenile Reports,[8] these plaintiffs have not offered, nor can the Court find, any legal support for the proposition that the execution of a Juvenile Report itself constitutes a seizure that is subject to the protections of the Fourth Amendment.

Furthermore, even if the Court were to assume that the execution of a Juvenile Report could somehow constitute a "constructive seizure," such a seizure would nevertheless be permissible under the Fourth Amendment, regardless of its adverse effects on the privacy of the individual, as long as the preparation of the report has a sufficiently close relationship to a legitimate governmental objective. *See Lauro v. Charles,* 219 F.3d 202, 212 (2d Cir.2000); *see also id.* at 209 ("[A] Fourth Amendment examination of a search or seizure ... requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state.").

Based on the materials annexed to Plaintiffs' pleading, the NYPD's procedures, in conformity with the *Cuevas* Stipulation, ensure that information regarding Juvenile Reports is disclosed only in the following limited circumstances: (1) to Youth Officers, Youth Division Personnel or Detectives in connection with an investigation, (2) to Desk Officers when exercising discretion to arrest or not arrest a juvenile, or (3) to public or private agencies, but only for the purposes of rehabilitation or treatment services. (*See Cuevas* Stip. at 5–7; 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual).) The Juvenile Plaintiffs have not alleged that any information regarding their Juvenile Reports has been disclosed in violation of these procedures.

It is thus apparent from Plaintiffs' pleading and the attached materials that the execution and maintenance of Juvenile Reports exerts only a minimal intrusion on the privacy interests of the individuals for whom such reports are maintained. It also appears that the execution and maintenance of the Juvenile Reports is closely related to the NYPD's stated governmental objectives of maintaining records for juveniles in lieu of complaint reports, diverting juveniles from the court process, and identifying potential delinquents (*see* 3d Am. Compl., Ex. D (excerpt from NYPD Juvenile Reference Manual; *see also infra* at 386–87)), and Plaintiffs have not seriously challenged the legitimacy of these goals. For these reasons, Febres and Padouvas have failed to state a claim under Section 1983, based on any Fourth Amend-

---

8. Based on the description in Plaintiffs' pleading, the arrest of Febres was certainly a "seizure" within the meaning of the Fourth Amendment, and, although Padouvas was not arrested, it is possible that her detention in the presence of a police officer would also have constituted a "seizure" triggering the protections of the Fourth Amendment.

ment violation. Accordingly, this class claim (the Fifth Cause of Action) is dismissed.

## 2. *Substantive Due Process Claim (Pleaded on Behalf of the Putative Juvenile Class)*

Febres and Padouvas also appear to allege, on behalf of the putative Juvenile Class, that the execution and maintenance of Juvenile Reports violates the class members' rights under Section 1983 because Defendants' conduct infringes the class members' constitutional rights to substantive due process.

The "constitutional notion of due process rests on the bedrock principle that we must protect the individual 'against ... the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Velez*, 401 F.3d at 94 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)); *see also Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). Nonetheless, "[t]here is ... no substantive constitutional right to be free from arbitrary government action as such .... The right, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right." *O'Connor v. Pierson*, 426 F.3d 187, 200 n. 6 (2d Cir.2005) (internal citation and quotation omitted). In this case, Febres and Padouvas allege that the execution and maintenance of Juvenile Reports infringes their right to privacy, which is protected under the Fourteenth Amendment. *See Whalen v. Roe*, 429 U.S. 589, 598–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *see also* 3d Am. Compl. ¶¶ 21, 186.

■ "The privacy right takes two somewhat different forms: the right to personal autonomy (i.e., the right to make certain choices free of unwarranted government in-

terference) and the right to confidentiality (i.e., the right to hold certain information private)." *O'Connor*, 426 F.3d at 201 (citations omitted); *see also Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir.1994) ("There is ... a recognized constitutional right to privacy in personal information."). As, unquestionably, there is no right to engage in illegal activity free from government interference, the Juvenile Plaintiffs' apparent contention is that the execution and maintenance of Juvenile Reports violates their right to hold certain information private. Yet, even assuming that the Juvenile Plaintiffs have a privacy interest in the information contained in the Juvenile Reports, their substantive due process claim fails. This is because "only the most egregious official conduct ... will subject the government to liability for a substantive due process violation based on executive action." *O'Connor*, 426 F.3d at 203 (internal quotation marks and citation omitted).[9] Thus, "[f]or a substantive due process claim [challenging executive action] to survive a ... dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez*, 401 F.3d at 93 (quoting *Sacramento*, 523 U.S. at 847 n. 8, 118 S.Ct. 1708).

■ As discussed above, the execution and maintenance of Juvenile Reports serves specific governmental objectives that have been articulated by the NYPD. (*See supra* at 383–84; 3d Am. Compl., Ex. D (excerpt from NYPD Juvenile Reference Manual); *see also infra* at 386–87.) Furthermore, as required by the *Cuevas* Stipulation, procedures have been put into place to protect the confidentiality of the information contained in the Juvenile Reports, permitting the disclosure of such information only in limited circumstances. (*See supra* at 383–84; *Cuevas* Stip. at 5–7; 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual).)[10] In

9. When constitutionally protected privacy rights are burdened by *legislation*, intermediate scrutiny should be applied, and the statute should be upheld only if a substantial government interest outweighs the burdened privacy right. *O'Connor*, 426 F.3d at 202–03. "The Supreme Court has, however, set the bar higher for challenges to

executive action." *Id.* at 203 (citing *Sacramento*, 523 U.S. at 846, 118 S.Ct. 1708).

10. In *Whalen v. Roe*, in which the Supreme Court upheld a New York law requiring that state records be kept of all prescriptions for controlled substances with a potential for abuse, the Court explained that statutory or administra-

the absence of any allegation that these confidentiality measures are being disregarded by the police, the execution and maintenance of Juvenile Reports can hardly be said to qualify as "government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ...." *Richmond Boro Gun Club v. City of New York*, 97 F.3d 681, 688 (2d Cir.1996); *cf. Castro v. City of New York*, Nos. 94 Civ. 5114(JFK), 94 Civ. 6767(JFK), 1996 WL 617341, at *2, 1996 U.S. Dist. LEXIS 15870, at *5 (S.D.N.Y. Oct. 25, 1996) ("If defendants intend to imply that disclosure of disciplinary records is barred by substantive due process, the short answer is that there is no legal authority that would remotely support such an argument.").

Thus, even accepting the Juvenile Plaintiffs' factual allegations as true and drawing every inference in their favor, these plaintiffs have failed to state a claim under Section 1983, based on the violation of any Fourteenth Amendment right to substantive due process. Accordingly, their class claim to that effect (the Sixth Cause of Action) is dismissed.

### 3. *Equal Protection Claim (Pleaded on Behalf of the Putative Juvenile Class)*

■ Although the Third Amended/Supplemental Complaint does not include a numbered "Cause of Action" alleging a Section 1983 violation based on a denial of equal protection of the laws, Plaintiffs mention "equal protection" in the section of their pleading summarizing their class allegations. (*See* 3d Am. Compl. ¶ 21 ("[T]he Plaintiffs contend that the execution and/or maintenance of the ... [Juvenile Report] violates the Plaintiffs' respective substantive due process and/or equal protection rights under the Fourteenth Amendment to the United States Constitution").) The parties also address a

potential equal protection claim in their briefing on Defendants' motion. (*See* Pl. Mem. at 49–52.) Accordingly, the Court will address the viability of such a claim.

The Fourteenth Amendment guarantees that "no state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. This means the state must treat similarly situated individuals similarly, in the absence of an adequate reason to distinguish between them. *See, e.g., Ramos v. Town of Vernon*, 353 F.3d 171, 174 (2d Cir.2003). The Juvenile Plaintiffs apparently contend that, because the NYPD's program for the execution and maintenance of Juvenile Reports treats juveniles differently from adults, the program violates the Juvenile Plaintiffs' rights under the Equal Protection Clause, giving rise to a Section 1983 claim. (*See* Pl. Mem. at 49–52.)

The Supreme Court has repeatedly held that age is not a suspect classification under the Equal Protection Clause. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Gregory v. Ashcroft*, 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam).[11] Thus, "[s]tates may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest." *Kimel*, 528 U.S. at 83, 120 S.Ct. 631.

On the other hand, when a classification burdens a group's exercise of a fundamental right, strict scrutiny is generally applied. *See Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). In the context of minors' rights, however, the Su-

tive provisions that safeguard the confidentiality of such information serve to protect the individual's interest in privacy. *See Whalen*, 429 U.S. at 605–606, 97 S.Ct. 869 ("The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and

its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy.").

11. Although old age, rather than youth, has been the burdened class in all of these cases, "courts typically assume that no age cohort is a suspect class." *Ramos*, 353 F.3d at 181 n. 4 (citation omitted).

preme Court has recognized that "although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability ...." *Bellotti v. Baird,* 443 U.S. 622, 635, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion). This is particularly true in the context of the criminal justice system, and it is well established that juveniles may be treated differently from adults in such circumstances, even when fundamental rights are implicated. *See Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (recognizing that although "the Due Process Clause is applicable in juvenile proceedings[,] ... the Constitution does not mandate elimination of all differences in the treatment of juveniles." (citations omitted)); *McKeiver v. Pennsylvania,* 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (finding no constitutional right to a jury trial in juvenile court); *United States ex rel. Murray v. Owens,* 465 F.2d 289, 294 (2d Cir.1972) ("The juvenile system treats juvenile offenders differently from adult criminals in many ways, yet the distinctions are tolerated or encouraged in consideration of their recognition of and reasonable relation to the legitimate, different objectives of the juvenile and criminal systems."); *People ex rel. Wayburn v. Schupf,* 39 N.Y.S.2d 682, 689, 385 N.Y.S.2d 518, 350 N.E.2d 906 (1976) ("[S]ociety, the Legislatures and the courts all recognize that, while the individual rights of children as well as of adults are entitled to constitutional protection, there are significant, even compelling, differences between children and adults which permit different procedures with respect to criminal behavior without denial of constitutional equal protection or due process.").

Thus, when a classification impinges upon the exercise of minors' fundamental rights, courts have attempted to incorporate plaintiffs' status as minors into the equal protection framework. *See Ramos,* 353 F.3d at 176–181 (discussing three different approaches used by courts addressing the constitutionality of juvenile curfew ordinances).[12] In *Ramos,* the Second Circuit determined that intermediate scrutiny should be applied to the juvenile curfew ordinance at issue, concluding that "intermediate scrutiny is sufficiently skeptical and probing to provide the rigorous protection that constitutional rights deserve... [and] is flexible enough to accommodate legislation carefully drafted to account for children's vulnerability." *Id.* at 181 (internal quotation marks and citation omitted). Here, even if the Court were to assume that the execution and maintenance of Juvenile Reports implicates a fundamental privacy right, and, therefore, that intermediate scrutiny should be applied, the Juvenile Plaintiffs' equal protection claim would nonetheless fail.

To satisfy the intermediate scrutiny standard, "the state must show that the challenged classification serves 'important governmental objectives and that the discriminatory means employed [are] substantially related to the achievement of those objectives.'" *Ramos,* 353 F.3d at 180 (quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980)). In this case, the Juvenile Plaintiffs allege that they are treated differently from adults because there is no "adult report" that is comparable to a Juvenile Report. Yet even if the Court were to accept this as true for purposes of this motion,[13] the Equal Protection Clause

---

12. *See id.* at 176–77 ("The first approach defines the relevant interest so narrowly that it is not deemed a constitutional right and heightened scrutiny does not come into play. Under this methodology, the characteristic that defines the plaintiffs' class—youth—divests them of a right they would otherwise hold. The second approach recognizes that children, like adults, have a constitutional right ... but then reduces the level of scrutiny to compensate for children's special vulnerabilities.... The third approach assumes that once a constitutional right has been recognized, its exercise by minors should be pro-

tected by strict scrutiny, just as it is for adults." (internal citations omitted).)

13. According to Defendant, an "Online Booking Sheet" is filled out for any adult who is arrested, regardless of whether the adult's criminal case goes beyond the arrest procedures at the precinct. (*See* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss, dated May 2, 2005, at 17 (citing New York City Police Patrol Guide 210–13, attached to the Supplemental Declaration of Deborah I. Meyer, dated May 2, 2005, as Ex. F).) Additionally, Defen-

would not be violated because the execution and maintenance of Juvenile Reports serves important governmental objectives, and the means employed are substantially related to the achievement of those objectives. (*See supra* at 383–84; 3d Am. Compl., Ex. D (excerpt from NYPD Juvenile Reference Manual)); *cf. United States v. Flowers*, 983 F.Supp. 159, 163–65 (E.D.N.Y.1997) (stating that the benefits of pretrial diversion programs are well-recognized and noting that the federal court's pretrial diversion program was originally used to divert juvenile offenders from the criminal justice system so that they would not be stigmatized by prosecution and conviction); *People ex rel. Intner v. Surles*, 149 Misc.2d 644, 566 N.Y.S.2d 512, 513–14 (N.Y.Sup.Ct.1991) (explaining that the Legislature provided for extensive pre-hearing inquiries prior to juvenile delinquency proceedings because it "found 'that many cases involving [juveniles] and their families now presented to the family court could be resolved through non-judicial remedies, with much more success for the youth, the family and the community, and at much less public expense.' " (quoting Laws 1985, ch 813, § 1)); *People v. Price*, 100 Misc.2d 372, 419 N.Y.S.2d 415, 418 (N.Y.Sup.Ct.1979) (explaining that juvenile delinquency pre-adjudication procedures "effectuate ... important public policies" that "(1) ... screen from the court those juveniles who, because of age, a good prior history, or other factors, could derive no benefit from court involvement and might be damaged by its stigma; (2) ... return the juvenile to the community prior to the initiation of court proceedings through diversion programs; and (3) ... shield an overburdened Family Court from those cases which do not require court action.") Therefore, the Juvenile Plaintiffs have failed to state a claim under Section 1983 based on an equal protection violation, and any such claim that may be contained in Plaintiffs' Third Amended/Supplemental Complaint is dismissed.

### 4. Procedural Due Process Claims (Pleaded on Behalf of the Putative Juvenile and Parent/Guardian Classes)

Both the Juvenile Plaintiffs and the Parent Plaintiffs appear to assert class claims under Section 1983 based on alleged violations of their rights to procedural due process.

"To formulate a [procedural due process] claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994). In adjudicating such a claim, the Court "must first determine (1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process Plaintiffs were due before they could be deprived of that interest." *Sealed v. Sealed*, 332 F.3d 51, 55 (2d Cir.2003) (citation omitted); *accord Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir.2005) (on a procedural due process claim, court must "consider two distinct issues: (1) whether Plaintiffs possess a liberty or property interest protected by the Due Process Clause; and, if so, (2) whether existing state procedures are constitutionally adequate"). Thus, as a threshold inquiry, this Court must first determine whether each group of Plaintiffs (juveniles and parents) have demonstrated the existence of a constitutionally protected liberty or property interest. Only if they possess such an interest would the Court need to reach the second issue, *i.e.*, the adequacy of the NYPD's procedures for protecting that interest.

### a. The Juvenile Plaintiffs Do Not Possess a Liberty Interest Protected by the Due Process Clause.

█ The Juvenile Plaintiffs appear to assert that they have a constitutionally protected "liberty interest" that is violated by the execution and maintenance of Juvenile Reports because (1) the Juvenile Report allegedly stigmatizes the minor for whom it is created and (2) the Juvenile Report may be

---

dants assert that, even when an arrest is voided, the original complaint and an accompanying

"voided arrest" report are maintained in the computer and precinct files. (*See id.* at 17–18.)

used to identify the minor as a potential delinquent and to determine whether the minor should be arrested. (*See* 3d Am. Compl. ¶¶ 166, 189; Pl. Mem. at 26–30.)

"A § 1983 liberty interest claim of this sort—commonly referred to as a 'stigma plus' claim—requires a plaintiff to allege (1) the utterance of a statement about [plaintiff] that is injurious to [plaintiff's] reputation, that is capable of being proved false, and that he or she claims is false, and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement." *Velez*, 401 F.3d at 87 (internal quotation marks and citations omitted). It is, of course, axiomatic that a "stigma plus" claim requires stigma. Thus, the allegedly defamatory statement "must be sufficiently public to create or threaten a stigma . . . ." *Id.* (citing *Donato v. Plainview–Old Bethpage Cent. School Dist.*, 96 F.3d 623, 631–32 (2d Cir. 1996)); *see also Valmonte*, 18 F.3d at 999–1000 (explaining that a plaintiff must allege that the government's action "will result in stigma, that is, in public opprobrium and damage to [plaintiff's] reputation" (internal quotation marks and citation omitted)).

Generally, the requisite stigma, or damage to plaintiff's reputation, is created by public dissemination of the allegedly false information. *See, e.g., Wisconsin v. Constantineau*, 400 U.S. 433, 434, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (public posting by local officials of list of persons who became dangerous after "excessive drinking of intoxicating liquors"); *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38 (2d Cir.2001) (public dissemination of sex offender registry), *rev'd on other grounds sub nom. Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). In due process claims involving the termination of employment, stigma may also be established when damaging information is disclosed to potential employers. *See Valmonte*, 18 F.3d at 1000; *see also Brandt v. Board of Cooperative Educational Services*, 820 F.2d 41, 44 (2d Cir. 1987) ("In determining the degree of dissemination that satisfies the 'public disclosure' requirement, we must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job opportunities.").

No such public disclosure of damaging information is pleaded here. Once again, as shown by the materials annexed to Plaintiffs' own pleading, NYPD procedures provide that information regarding Juvenile Reports is to be disclosed only in the following limited circumstances: (1) to Youth Officers, Youth Division Personnel or Detectives in connection with an investigation, (2) to Desk Officers when exercising discretion to arrest or not arrest a juvenile, or (3) to public or private agencies, but only for the purposes of rehabilitation or treatment services. (*See Cuevas* Stip. at 5–7; 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual).) The *Cuevas* Stipulation also specifically prohibits disclosure of information regarding Juvenile Reports to any person or agency in relation to employment. (*See Cuevas* Stip. at 6; 3d Am. Compl., Ex. C.) As noted above, the Juvenile Plaintiffs have not alleged that any information regarding Juvenile Reports has been—or, for that matter, is likely to be—disclosed in violation of these procedures.

Even accepting the Juvenile Plaintiffs' allegations as true, disclosure in the limited circumstances outlined above would be insufficient, as a matter of law, to create the requisite stigma that is essential to a "stigma plus" claim. Accordingly, to the extent the Juvenile Plaintiffs claim a deprivation of any liberty interest, their Section 1983 claim based on an alleged denial of procedural due process (the Seventh Cause of Action) cannot stand.[14]

### b. Neither the Parent Plaintiffs Nor the Juvenile Plaintiffs Possess a Property Interest Protected by the Due Process Clause.

The only federal class claim asserted by the Parent Plaintiffs is a Section 1983 claim predicated on the alleged failure of Defendants to afford them procedural due process under the Fourteenth Amendment. Essentially, the Parent Plaintiffs claim that

14. To the extent the Juvenile Plaintiffs' Seventh Cause of Action also rests on any alleged deprivation of a claimed property interest, the claim is discussed below.

the *Cuevas* Stipulation and associated NYPD procedures have given them an entitlement (*i.e.,* a "property" right) to be notified when Juvenile Reports have been prepared for their children, to be provided with copies of such reports, and to challenge the accusations contained in the reports, and that this entitlement rises to the level of a "property interest" protected by the Fourteenth Amendment. (*See* 3d Am. Compl. ¶¶ 22, 192; *see also* Pl. Mem. at 22–23 (arguing that the *Cuevas* Stipulation, the NYPD policies and procedures mandated by the *Cuevas* Stipulation, and the NYPD Patrol Guide Juvenile Report provisions together create a substantive entitlement that constitutes a constitutionally protected "property interest" requiring due process protection).) Further, although the *Cuevas* Stipulation and NYPD procedures only state that *parents or guardians* are to be notified of the preparation of a Juvenile Report and of their right to request an investigation (*see Cuevas* Stip. at 7); 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual), the Juvenile Plaintiffs appear to claim that the relevant procedures also give *them* Fourteenth Amendment property interests, equivalent to the interests of their parents (*see* 3d Am. Compl. ¶ 167).

A state or local agency's internal administrative procedures, however, generally do not give rise to property interests that are subject to protection under the Fourteenth Amendment. On the contrary, protected property interests are generally created by an independent source of law, such a state or federal statute. *Compare, e.g., Castro,* 1996 WL 617341, at *2, 1996 U.S. Dist. LEXIS 15870, at *7 ("Whatever the language of the cited Police Department policy, it does not confer on the officers a property or liberty entitlement."), *with O'Connor,* 426 F.3d at 196 (citing Connecticut state statute as providing the source of a tenured, public school teacher's "property interest" in being discharged only for cause); *see also Conn. Bd. of Pardons v. Dumschat,* 452 U.S. 458, 463, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981) (While

"[a] state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right . . . the underlying right must have come into existence before it can trigger due process protection.") (citations omitted).

Indeed, even when "detailed and comprehensive procedures [are] . . . mandated by state law[,] . . . such *procedures,* standing alone, create no independent *substantive* entitlements, whose deprivation might trigger application of the Due Process Clause." *Sealed,* 332 F.3d at 57 (emphasis in original) (citing *Olim v. Wakinekona,* 461 U.S. 238, 250–51, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) ("The State may choose to require procedures . . . but in making that choice the State does not create an independent substantive right.")); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("Elevating a state-mandated procedure to the status of a constitutionally protected liberty or property interest would make process an end in itself rather than a requirement whose constitutional purpose is to protect a substantive interest in which the individual has a claim of entitlement.") (internal quotation marks and citations omitted); *cf. Galapo v. City of New York,* 95 N.Y.2d 568, 574–75, 721 N.Y.S.2d 857, 744 N.E.2d 685 (2000) (finding that the NYPD Patrol Guide could not give rise to liability under a state statute, primarily because it was not a "duly-enacted body of law or regulation," and stating that, "though some of its provisions are couched in mandatory terms, the Patrol Guide does not prescribe the specific action to be taken in each situation encountered by individual officers, but rather is intended to serve as a guide for members of the Police Department.") Thus, standing alone, the NYPD procedures regarding the execution and maintenance of Juvenile Reports do not create an independent, substantive property interest to which due process protection attaches.

Nor does the fact that the NYPD procedures were mandated by a court order (*i.e.,* the "so ordered" *Cuevas* Stipulation)[15] ren-

---

15. In *Cuevas,* the terms of the settlement agreed to by the parties were incorporated into a stipulation that was "so ordered" by the court, and the stipulation specifically provided for the court

to retain jurisdiction over the action. (*See Cuevas* Stip. at 9–10.) The *Cuevas* Stipulation may therefore be considered the equivalent of a consent decree. *See Torres v. Walker,* 356 F.3d 238,

der them capable of giving rise to substantive property interests protected by the Fourteenth Amendment. On this point, Plaintiffs rely on *Coffman v. Wilson Police Department*, 739 F.Supp. 257 (E.D.Pa.1990), for the proposition that a court order may create such a property interest. (*See* Pl. Mem. at 20–21.) In *Coffman*, the court found that a protective order, issued to protect an abused woman from her husband, entitled the woman, under the Due Process Clause, to police enforcement of the order. *Coffman*, 739 F.Supp. at 259, 264. Subsequent to the submission of Plaintiffs' brief on the instant motion, however, the Supreme Court held, in *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), that even mandatory terms in a court-issued restraining order are insufficient to create a property interest protected by the Fourteenth Amendment. *See id.* at 2810. Thus, Plaintiffs' citation to *Coffman* is no longer persuasive. *See Starr v. Price*, 385 F.Supp.2d 502, 509 (M.D.Pa.2005) ("In light of the Supreme Court's recent decision in *Town of Castle Rock v. Gonzales*, we find that *Coffman* is not an accurate statement of the law.").

In short, while a consent decree may protect underlying constitutional rights, it does not itself create an independent substantive right to which due process attaches. *See Browdy v. Karpe*, No. 3:00 CV 1866(CFD), 2004 WL 2203464, at *4, 2004 U.S. Dist. LEXIS 19299, at *12 (D.Conn. Sept. 20, 2004) (holding that the "existence of a remedial court order or settlement agreement is not an independent basis for a constitutional claim under section 1983") (citation omitted), *aff'd*, 131 Fed.Appx. 751 (2d Cir.2005); *see also Green v. McKaskle*, 788 F.2d 1116, 1123 (5th Cir.1986) ("[R]emedial court orders per se, apart from independent constitutional grounds affirmed there, cannot serve as a substantive basis for a § 1983 claim for damages because such orders do not create 'rights, privileges, or immunities secured by the Constitution and laws.'" (quoting 42 U.S.C. § 1983)).[16]

In any event, even if the NYPD's internal administrative procedures, established as the result of a court order, could be viewed as giving rise to any substantive property right, any such right would only be constitutionally protected if it were a legitimate "entitlement" to a defined, non-discretionary, administrative outcome. *See Sealed*, 332 F.3d at 56 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Where a state does not place substantive limits on administrative discretion, it does not create the necessary "entitlement." *See Sealed*, 332 F.3d at 56 ("Where the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment.") (citing *Kelly Kare, Ltd.*

243–44 (2d Cir.2004) (explaining that, where the terms of the settlement are incorporated into the district court's order and the court has placed its "judicial imprimatur" on the parties' agreement, the stipulation may be considered a consent decree); *Handschu v. Special Servs. Div.*, 273 F.Supp.2d 327, 331 (S.D.N.Y.2003) ("This Court placed upon the stipulation of settlement and the accompanying Guidelines [governing the NYPD's investigation of political activity] the imprimatur of its own order, thereby investing them with the procedural and substantive trappings of a consent decree.").

**16.** As a consent decree cannot create rights enforceable under the Due Process Clause, the proper "remedy for breach of [a consent decree] is a suit for ... enforcement of the decree through judicial sanctions, including contempt, not an action under § 1983." *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir.1983); *see also Marable v. Kurtz*, No. 99 Civ. 1387(LAP), 2000 WL 1279763, at *6, 2000 U.S. Dist. LEXIS 12969, at *18 (S.D.N.Y. Sept. 11, 2000) (finding that the existence of a remedial court order is not a separate basis for a constitutional claim, and that a claim that a consent decree has been violated is properly raised in a contempt proceeding). Thus, to the extent that Plaintiffs claim that the NYPD has violated the terms of the *Cuevas* Stipulation, their remedy lies with the *Cuevas* court. *See Holiday v. Martinez*, 68 Fed. Appx. 219, 221 (2d Cir.2003) (explaining that parties must seek enforcement of a consent decree through the issuing court, not through a separate action brought under 42 U.S.C. § 1983); *see also Browdy*, 2004 WL 2203464, at *4, 2004 U.S. Dist. LEXIS 19299, at *12–13 ("The proper way to challenge a violation of a consent decree or settlement agreement is through a contempt or breach of contract proceeding in the court in which the consent decree or settlement agreement was consummated." (citations omitted)).

*v. O'Rourke,* 930 F.2d 170, 175 (2d Cir.1991)) (emphasis in original); *see also Kapps,* 404 F.3d at 113–18 (holding that, where state law mandated an award of benefits based on non-discretionary, "fixed eligibility criteria," plaintiffs possessed a valid property interest in such benefits); *cf. Olim,* 461 U.S. at 249, 103 S.Ct. 1741 (addressing the plaintiff's claimed "liberty interest" in a state prison transfer, and holding that, if the administrative decision-maker is permitted to deny the requested relief for any reason, then "the State has not created a constitutionally protected liberty interest") (citing *Dumschat,* 452 U.S. at 466–67, 101 S.Ct. 2460).

Here, there is no regulatory language or scheme that dictates that, as a result of the NYPD procedures, the Parent or Juvenile Plaintiffs have secured any absolute "entitlement" to any particular benefit. First, the Court notes that, pursuant to the *Cuevas* Stipulation, the NYPD has the "unfettered right" to discontinue the NYPD's entire program of creating Juvenile Reports, or any successor program. (*See Cuevas* Stip. at 9.) Given the NYPD's authority to discontinue the program in its sole discretion (*see id.*), it is plain that there is no guaranteed right of a juvenile to any of the measures afforded by the existing administrative scheme. Second, the NYPD procedures, and the *Cuevas* Stipulation from which they derive, do not provide that parents or guardians have any rights beyond (1) receiving notice that Juvenile Reports have been prepared for their children, and (2) being informed that a follow-up investigation may be requested. (*See Cuevas* Stip. at 7) ("[T]he Regulations of the Police Department shall be amended to provide clearly for (a) the notification of parents and guardians ... [and] (b) advice to such parents that a follow-up investigation to determine the accuracy of the allegation can be requested by them ...."); *see also* 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual.) If Plaintiffs are suggesting that these procedures give rise to an entitlement to a favorable *disposition* upon an investigation, then they are making that suggestion without any support. Certainly, they point to no wording in the *Cuevas* Stipulation or the written NYPD procedures that assures such an outcome upon satisfaction of

fixed criteria. In fact, the procedures merely state that Juvenile Reports are to be destroyed when, upon investigation, they are "deemed" to be unfounded. (*See* 3d Am. Compl., Ex. C (excerpt from NYPD Juvenile Reference Manual)). While the *Cuevas* Stipulation provides that "investigations shall determine [Juvenile Reports] to be 'unfounded' whenever the facts, including facts supplied by the juvenile or his parents, fail to support the charge indicated" (*Cuevas* Stip. at 7), there are no specific criteria that limit the discretion of the investigating officer in making that determination.

For all of these reasons, neither the Parent nor the Juvenile Plaintiffs have adequately pleaded that they possess a property interest protected by the Due Process Clause. Accordingly, the Parent Plaintiffs' Section 1983 claim based on the denial of procedural due process (the Eighth Cause of Action) is dismissed. In addition, the Juvenile Plaintiffs' procedural due process claim (the Seventh Cause of Action) is dismissed in its entirety.

### 5. Federal Monell-based Claim Against the City of New York (Pleaded on Behalf of Both Putative Plaintiff Classes)

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court established that a city may be sued under Section 1983 where the action that is alleged to be unconstitutional implements or executes an official policy or custom of that city. *Id.* at 690, 98 S.Ct. 2018; *see also Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir.2004) (explaining that a *Monell* claim may be asserted by alleging that a municipal policy or ordinance is itself unconstitutional). Nonetheless, where a plaintiff fails to plead an underlying constitutional violation, any corresponding cause of action against the municipality will necessarily fail, since a *Monell* claim is only actionable where some constitutional violation actually occurred. *Amato v. City of Saratoga Springs,* 170 F.3d 311, 320 (2d Cir.1999); *see also Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no

underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.") As Plaintiffs here have failed to state a claim for any underlying constitutional violation, Plaintiffs' *Monell* claim (the Tenth Cause of Action) is dismissed.

### B. *State Claims*

■ Although Plaintiffs make no reference to state law in the section of their pleading that summarizes their class action allegations (*see* 3d Am. Compl., Section IV), they nonetheless appear to assert class-wide claims based on New York State constitutional and/or common law, in their Eleventh and Twelfth Causes of Action. It is unclear whether these claims are a subject of the motion before the Court, as Defendants purport to move against Plaintiffs' class action claims, yet never address any state-law claims in their briefing. As state constitutional law essentially mirrors federal law in all relevant respects, however, it is apparent that, to the extent Plaintiffs have alleged that the execution and maintenance of Juvenile Reports violates the New York State constitution, Plaintiffs' state-law class claims must fail for the same reasons discussed above in connection with Plaintiffs' federal constitutional claims.

The New York State constitution's guarantees of equal protection and due process are virtually coextensive with those of the federal Constitution. *Coakley v. Jaffe*, 49 F.Supp.2d 615, 628 (S.D.N.Y.1999) (citing *Central Savings Bank v. City of New York*, 280 N.Y. 9, 19 N.E.2d 659 (1939) (per curiam); *Manshul Constr. Corp. v. New York City Constr. Auth.*, 192 A.D.2d 659, 596 N.Y.S.2d 475, 476 (2d Dep't 1993); *Cucchi v. New York City Off–Track Betting Corp.*, 818 F.Supp. 647, 655 n. 11 (S.D.N.Y.1993)). Accordingly, the conclusion that Plaintiffs' federal equal protection and due process rights were not violated dictates the conclusion that the Plaintiffs' parallel rights under the state constitution were also not infringed. *Coakley*, 49 F.Supp.2d at 628. Search and seizure rights under the New York State and United States constitutions are also largely coextensive. *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 408 n. 3 (S.D.N.Y.2004); *see also People v. Johnson*, 66 N.Y.2d 398, 406, 497 N.Y.S.2d 618, 488 N.E.2d 439 (1985) ("[T]his court has repeatedly stated that the proscription against unlawful searches and seizures contained in N.Y. Constitution, article I, § 12 conforms with that found in the 4th Amendment, and that this identity of language supports a policy of uniformity between State and Federal courts."). Although, in certain contexts, the search and seizure clause of the New York State constitution is more stringent than the equivalent clause in the Fourth Amendment, *see, e.g., People v. Torres*, 74 N.Y.2d 224, 228, 544 N.Y.S.2d 796, 543 N.E.2d 61 (1989) (citing cases), nothing in this precedent remotely suggests that a more protective state constitutional standard is applicable to the execution and maintenance of Juvenile Reports. Therefore, to the extent that Plaintiffs have alleged any state constitutional claims based on the execution and maintenance of Juvenile Reports, those claims are subject to dismissal for the reasons discussed above in connection with Plaintiffs' federal constitutional claims.

Furthermore, regardless of whether Plaintiffs' state-law class claims are based on the state constitution or common law, those claims would in any event appear to be defective because Plaintiffs have failed to allege that they filed any notice of claim, as required by New York General Municipal Law Sections 50–e and 50–i. *See Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir.1999) (holding that in federal court, state notice-of-claim statutes apply to state-law claims).

Filing a notice of claim is a statutory precondition to filing suit against the city or its employees. *See Harris v. Bowden*, No. 03 Civ. 1617(LAP), 2006 WL 738110, at *6, 2006 U.S. Dist. LEXIS 12450, at *22 (S.D.N.Y. Mar. 23, 2006). By their terms, Sections 50–e and 50–i require any party asserting a state-law tort claim against a municipal entity, or its employees acting in the scope of their employment, to file a notice of claim within 90 days of the incident giving rise to the claim, and further require the plaintiff to commence the action within a year and 90

days from the date on which the cause of action accrues. *See* N.Y. Gen. Mun. Law §§ 50–e, 50–i. Section 50–i specifically provides that "it shall appear by and as an allegation in the complaint ... that at least thirty days have elapsed since the service of such notice ...." N.Y. Gen. Mun. Law § 50–i(1). Thus, "[a] plaintiff is required to affirmatively plead in his complaint that he has filed a notice of claim." *Hyde v. Caputo*, No. 98 CV 6722(FB)(ASC), 2001 WL 521699, at *4, 2001 U.S. Dist. LEXIS 6253, at *13 (E.D.N.Y. May 11, 2001) (citing *Davidson v. Bronx Mun. Hosp.*, 64 N.Y.2d 59, 61–62, 484 N.Y.S.2d 533, 473 N.E.2d 761 (1984)).

While the statute itself refers to tort claims, the New York notice-of-claim requirements have been held to apply not only to common law tort actions, but also to actions founded upon violations of state constitutional provisions. *Alexander v. City of New York*, No. 02 Civ. 3555(TPG), 2004 WL 1907432, at *22, 2004 U.S. Dist. LEXIS 17042, at *65–66 (S.D.N.Y. Aug. 25, 2004) (citing *423 South Salina Street, Inc. v. City of Syracuse*, 68 N.Y.2d 474, 489 n. 5, 510 N.Y.S.2d 507, 503 N.E.2d 63 (1986)). Further, the notice-of-claim requirements are strictly construed by New York state courts, *see Hardy*, 164 F.3d at 793, and "[a] plaintiff's failure to file a notice of claim requires dismissal of pendent state tort claims against the City or its employees in a federal civil rights action." *Robinson v. Matos*, No. 97 Civ. 7144(TPG), 1999 WL 225938, at *2, 1999 U.S. Dist. LEXIS 5447, at *4 (S.D.N.Y. Apr. 19, 1999) (citing *Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)); *see also McLaurin v. New Rochelle Police Officers*, 373 F.Supp.2d 385, 402 (S.D.N.Y.2005) ("A plaintiff's failure to comply with the mandatory New York statutory notice-of-claim requirements generally results in dismissal of his claims.").

In this case, Plaintiffs have not pleaded compliance with the notice-of-claim requirements for the state-law class claims asserted in the Eleventh and Twelfth Causes of Action. This suggests that each of these causes of action should be dismissed by the Court for failure to plead that a necessary precondition to suit has been satisfied.

As no party has briefed the issue, however, the Court will reserve decision as to whether any non-constitutional state claims contained in these two causes of action should be dismissed for failure to comply with Sections 50–e and 50–i. So that the Court may consider Plaintiffs' position on the issue, Plaintiffs are directed to show cause, within thirty days of the date of this Order, why any such claims should not be dismissed on this ground. To the extent, however, that Plaintiffs' Eleventh and Twelfth Causes of Action assert state constitutional claims, there is no need for the Court to reserve decision. Such claims are hereby dismissed for failure to state a claim, for the same reasons discussed above with respect to Plaintiffs' federal claims.

### CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss Plaintiffs' class action claims under Fed.R.Civ.P. 12 is granted with respect to all federal class claims, *i.e.*, Plaintiffs' Fifth, Sixth, Seventh, Eighth, and Tenth Causes of Action. In addition, to the extent Plaintiffs' Eleventh and Twelfth Causes of Action are based on alleged New York State constitutional violations, those claims are also dismissed.

To the extent the Eleventh and Twelfth Causes of Action are based on any non-constitutional state-law ground, Plaintiffs are directed to show cause, within thirty (30) days of the date of this Order, as to why such claims should not be dismissed for failure to plead compliance with the notice-of-claim requirement of New York General Municipal Law Sections 50–e and 50–i. Defendants may respond to Plaintiffs' submission within thirty (30) days of receiving service of Plaintiffs' papers.

Notwithstanding any further motion submissions, counsel are directed to confer in good faith regarding any discovery that may still be needed on plaintiff Febres's remaining individual claims, and to contact chambers to schedule a status conference regarding those claims.